Colleen Libby on behalf of Anthony Rankin. There are various totality of circumstances tests that are occurring in this case all interrelated. The most significant one that needs to be analyzed or first I believe is that there was a detention that occurred at the airport when law enforcement removed Mr. Rankin from the public area outside the airport to a warehouse area on back court that was non-public. Now it's our position that the factors at play that are enunciated in Mendenhall clearly indicate that Mr. Anthony was seized at the airport. Whether weapons were displayed, a firearm was not drawn but weapons were on the officer's person. Whether or not this occurred in a public or private setting, it was in a public or excuse me it was moved to a private setting not a public setting when Mr. Rankin was confronted and searched because the officer had him escorted him to the back part of the airport. So that factor would... Is that private? Well I wouldn't call it private per se but I wouldn't call it public either because only employees are allowed back there. It's not where the airport passengers go in that airport. Not very secluded. I mean the whole airport sounds like it fits in comfortably inside this room. Well you can hear on the audio it's very loud and but there Mr. Anthony is in a cargo area so I think because it's a big room that would magnify the echoing of the jet planes and what not. But it is establishing the record that that area where Mr. Rankin was taken was not where the passengers would normally be taken. It was for employees and cargo. Now another factor that favors finding that there was a tension is the tone that Mr. or that Officer Tuckwood used. If you listen to the audio the government asserts that he was friendly towards Mr. Rankin. I think the tone of the officer is bossy and demanding and assertive and you can tell this for a number of reasons. If Mr. Rankin is hesitant and doesn't respond to things and rather than tell Mr. Rankin you don't have to come with me or tell Mr. Rankin you don't have to consent to a search Trooper Tuckwood just reaffirms his position and moves forward. Well what did the district court say about that? With regard to? The tone. Oh I think they didn't agree with my position of the tone. Right. But if you listen to the audio and I mean. Well I did listen to the audio and certainly the trooper was firm but I don't know that I'd fairly describe it as commanding. I mean a lot of the requests were stated as questions albeit not questions that were begging in any fashion. Is there any particular statement that comes to mind that you think reflects a command as opposed to a request? Well when the trooper first confronts Mr. Rankin or early on in the conversation he says can I talk to you? Mr. Rankin doesn't say anything. He says I need to talk to you. And then he escorts and I misstated something in my brief. I said that Mr. Rankin said all right. But it's not Mr. Rankin that said all right to the response I need to talk to you. The officer said I need to talk to you all right. And then Mr. Rankin followed the officer into the back area. And another so him indicating he needs to talk with him I think that's more assertive. And certainly when he asks the initial questions he demands answers name, date of birth, where coming from, what's your business in Anchorage. And then he tells Mr. Rankin about the tip and he's taking the tip seriously and he needs to look into it. And at this point the trooper says something that would elicit an incriminating response. He asks the question whether there's anything on Mr. Rankin's person that I need to be concerned about. So he's asking Mr. Rankin and this ties in more into whether he was being interrogated. So I got off track on your question. But I think when he said you need to come with me that was the first time he was asserting authority. And it was different when he first approached Mr. Rankin and said hey do you know Iris. I mean definitely when Mr. Rankin was outside that was general, that was not a detention. It was the movement to the back and the questioning after that that would rise to that level. Now so our position on the tone would favor finding a detention. There wasn't any physical touchings, at least not of Mr. Rankin based on what I've seen in the records. So that factor wouldn't favor Mr. Rankin. What do we do with the fact that he handed over the bag? Well in response to that he did hand over the bag. But at that point before he handed over the bag there's some confusion about, there's confusion. Mr. Tuckwood or Officer Tuckwood even thinks Mr. Rankin might be confused about what he wants to search because the officer says object to me looking in your bags. And Rankin says if you want to. But then the trooper recognizes some confusion so he says I'm asking permission. Alcohol is a huge problem. I don't need to search the bags here. I could search somewhere else. And Rankin ends up just handing it over. He doesn't say yeah go ahead. It sounds pretty consensual to me. Well the problem with the consent here is that Rankin was confused and rather than tell Mr. Rankin you don't have to let me consent, he just keeps saying I need permission to search your bags. He doesn't ever tell him you don't have to let me search them. He just continues. Isn't that kind of the opposite side of the same coin? Is that the opposite side of the same coin? I need your permission before I can look at the backpack. Isn't that really saying you don't have to let me look at your backpack? Well then they'd always ask for permission. So then the factor, there's a factor that says did they tell the person they didn't have to consent. I think that that factor loses any weight if all they have to do is say can I have permission again. And another thing too is before he asked to search the bags, the officer indicated he had nothing, if Rankin had nothing to hide he had nothing to worry about. And so he conveyed that if, it's my position that that conveys that if Rankin doesn't let him search the bag, then he's going to pursue it anyways because he's got something to hide. And I'm going to reserve the rest of my time. You may. Thank you. Good morning. May it please the Court. My name is Joseph Bottini. I'm an Assistant U.S. Attorney here in Anchorage. It is, of course, highly significant that we're talking about the airport in St. Mary's, Alaska here versus a setting like LAX or SFO. This was a situation where Trooper Tuckwood exercised his judgment as far as his encounter with Mr. Rankin, given that the terminal part of this building is extremely small. In fact, you can hear it on the contact tape, the conversations and the noise going on there, exercised his judgment to ask Mr. Rankin to accompany him back to the warehouse area where it was quieter. This is markedly different from a situation where an airport police officer or DEA agent summons someone to come down to the resident DEA office or the resident airport police office at the airport. That warehouse area is referred to as a non-public area. But nevertheless, it's not like you're taking someone into a police office. There were other people back there. Granted, there were employees. The cargo door was open, as Trooper Tuckwood described in his testimony at the evidentiary hearing. It wasn't like Mr. Rankin was brought into a small office in the presence of multiple police officers when this encounter took place. Clearly, when you look at the facts, the totality of the circumstances here, this was a consensual encounter rather than a custodial contact. The search of Mr. Rankin's backpack was clearly consensual. Trooper Tuckwood was polite. Granted, his tone and manner of speech here is somewhat clipped. I would submit, though, if you listen further on into that contact tape, even when they're later riding in the truck to the trooper headquarters and the conversation becomes more conversational in tone versus inquiry about what's going on, his tone is the same. I think it's just the way this guy talks. So the fact that it is somewhat clipped and sounds somewhat abrupt, I don't think too much can be read into that as far as conveying a tone of command when he spoke with Mr. Rankin initially. But as far as the request to search the backpack, it's very clear. Trooper Tuckwood was polite about that. He had explained to Mr. Rankin by that time, even when he first initially asked him to come back to the cargo area, he said, Look, can I talk to you? You're not in any trouble. I need to talk to you. By the time he gets to the request to look into the backpack, he's already told Mr. Rankin why he's interested in talking to him. He said, We've received a tip that Iris Brown and you perhaps are bringing alcohol into the village. Wasn't this pretty well outlined in the magistrate judge's statement? It was, yes. The facts there are very well laid out. Was that adopted by the district court? It was. On de novo review it was. So clearly the initial contact here was a consensual contact. The search of the backpack was consensual. Mr. Rankin's spontaneous statement when Trooper Tuckwood found the firearm in the backpack was clearly not the product of custodial interrogation by which Miranda warnings would have been required. I didn't even ask him anything. Mr. Rankin saw that Trooper Tuckwood had found the gun and volunteered. He said, I'm going to go ahead and tell you that that's my firearm or my gun. So you would say that the findings aren't clearly erroneous? They're not clearly erroneous. They're certainly not. And the proper legal standard was applied? It was properly applied. Moving on to the sentencing issue, unless there are any other questions. There won't be any if you touch on the sentencing issue. Okay. As far as the two-point enhancement for possession of the stolen firearm, Judge Weisslein heard the testimony of Ms. Brown, who testified at the sentencing hearing, and found her to be a credible and honest witness. Mr. Rankin obviously was taking the position that the gun was not stolen, that she had basically done a straw purchase for him. And Judge Weisslein considered all of that. Having heard the testimony and evaluated the facts, he found that she was credible and honest. And clearly that finding is not erroneous. This was basically a credibility finding? It was basically a credibility finding. That's right. As far as his decision to depart upward from the guideline range, the advisory guideline range, Judge Weisslein relied primarily on the facts and circumstances here relating to Mr. Rankin's possession of the firearm, which involved possession of a loaded firearm on an aircraft. And Judge Weisslein was very troubled by that. He commented a couple of times before imposing a sentence about the inherently dangerous situation that that presents. And, of course, it is inherently dangerous for someone to possess a loaded firearm on an aircraft. His decision to impose a sentence of 60 months here, given that that was the concern, is certainly not illogical or implausible and clearly has support in the record and the inferences drawn from the facts that were presented in sentencing. Thank you. Thank you. I'd just like to respond to a few things. The government points out that this wasn't a DEA agent office that Mr. Rankin was taken to, but there wasn't a DEA office in the airport facility. This is where the law enforcement would take people to be questioned about crime. So the fact that it wasn't some small, tiny office, I don't think that. I think it still indicates that this was a more private setting that would favor finding him a seizure. Now, the government's asserted that Mr. Rankin's statement after the bag was searched was a spontaneous statement. It wasn't in response to any questioning. I'd like to point out that before, just before searching the bag, the officer asked Mr. Rankin if he had anything on his person that he needed to be concerned about. Now, this was his backpack, and in the backpack there's a firearm. So I think that Anthony making the statement, it's still in response to questioning that had just occurred prior to the search of the bag. Sorry, I thought that meant I was done. No, I don't know why it popped up like that with the noise. So there was a question about, I mean, it's our position that the judge did not apply the wrong legal standard, but the application of the facts to the law were not applied properly. And if you were to go through all the factors, and there's a lot of factors that favor in finding of a detention, that Mr. Anthony's, it's our position his route of travel was curtailed. He'd already left the airport, and he was outside in the area where people get picked up. Instead, he gets brought back into the facility. So his path of travel had been curtailed. I would like to point out one thing that I didn't make that clear in the brief. Mr. Anthony was transported from the airport to the trooper station in the vehicle of the trooper, and the court found that that wasn't a detention when he was in the, or he wasn't in custody when he was in the vehicle, and also that he didn't make any incriminating statements. But if you listen to the audio recording, he actually did make statements that the gun was not stolen. He made statements that he had bought it, that he wasn't trying to cause any problems. So there were incriminating statements made in the vehicle, and I think under DUNLAP the transport in the vehicle would clearly be in custody. Yeah, that's arguably in custody, but did he make any statements that didn't already repeat what he had said before? If we don't find the statement made at the airport that it was his gun, something subject to suppression, I'm not sure anything that he said later added anything to that. Well, he did make a statement that it wasn't stolen and that he, you know, wasn't trying to cause any problems. And also, right after the officer found the gun, he said, he did admit that it was loaded.  That means your time is up. It's giving me more time right now. It's putting more seconds on the clock. Oh, you're in the red. You're overtime. Anyway, I think we understand your position, and what are we going to do about this? I'm excused. Oh. Well, that's just because you turned the clock off, so. You turned the clock off? It's not running anymore. Okay, thank you. We're going to order this case submitted.
judges: Schroeder, O'scannlain, Clifton